IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND
Baltimore Division

| | |
|---|---|
| SHALE D. STILLER,<br>as Personal Representative<br>of the estate of Robert C. Austrian<br>6225 Smith Avenue<br>Baltimore, Maryland 21209-3600<br><br>       Plaintiff<br><br>   vs.<br><br>UNITED STATES OF AMERICA<br>Serve on:<br>Rod J. Rosenstein, Esquire<br>United States Attorney, District of Maryland<br>36 S. Charles Street<br>Fourth Floor<br>Baltimore, Maryland 21201<br><br>Copies to:<br>Eric H. Holder, Jr., U.S. Attorney General<br>United States Department of Justice<br>950 Pennsylvania Avenue, N.W.<br>Washington, D.C. 20530<br><br>Department of the Treasury<br>Internal Revenue Service<br>Cincinnati, Ohio 45999<br><br>       Defendant | Civil Action No.<br><br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff Shale D. Stiller, in his capacity as personal representative ("Personal Representative") of the estate of Robert C. Austrian ("Estate"), brings this claim against Defendant United States of America for refund of estate taxes in an estimated amount of

$14,779,066, and an additional refund of tax resulting from additional Estate expenses and corresponding deductions in an amount to be determined, plus all applicable interest and costs.

## NATURE OF THE ACTION

1.      Plaintiff Shale D. Stiller seeks to recover estate taxes and interest erroneously assessed and collected by the United States Internal Revenue Service (the "Service") from him as the Personal Representative of Dr. Austrian's Estate.  The Service has improperly refused to acknowledge the Estate's right to a tax deduction for (a) certain charitable remainder interests, (b) judicially reformed charitable interests, and (c) outright charitable bequests and other routinely deductible items, including state death tax payments, additional estate administration expenses, and estate legal fees.

2.      The fundamental question presented by this complaint is whether estate taxes may properly be imposed on transfers pursuant to Dr. Austrian's Will for the sole benefit of the Johns Hopkins University, the Johns Hopkins Hospital, the Park School, the Maryland Institute College of Art, the American Philosophical Society, the University of Pennsylvania School of Medicine, and the College of Physicians of Philadelphia (collectively, the "Charities"), each of which is a tax-exempt charity under Section 501(c)(3) of the Internal Revenue Code ("Code" or "IRC").

3.      No individual or taxable entity will be affected by the resolution of this claim, regardless of whether the final tax liability is an estimated $1.3 million, as the Personal Representative asserts, or an estimated $15.6 million, as assessed, plus increasing costs to the Estate from pursuing recovery.  Every dollar of tax at issue, as well as every dollar spent by the Estate in pursuing proper tax treatment, will be paid at the expense of the Charities Dr. Austrian sought to benefit in his Will.

4.      As explained in this complaint, the charitable remainder interests at issue are deductible because they clearly satisfy the specific requirements set forth in Code Sections 2055 and 664(d)(2).  The judicially reformed charitable interests are deductible as wholly charitable trusts from which, as required by Code Section 2055(e)(2), the possibility of any interest passing "for private purposes" is so remote as to be negligible.  The outright charitable bequests and other routinely deductible items apparently were either ignored or misunderstood by the Service as a consequence of its failure to analyze carefully and correctly the deductions the Estate reported.  This final, obvious error is emblematic of the Service's sweeping, persistent, and unreasoned refusal to recognize the Estate's right to appropriate tax deductions.

5.      As explained more fully below, the Service issued a May 27, 2011 Notice of Deficiency that disallowed all charitable deductions claimed by the Estate.  Two separate explanations accompanied the Notice, but neither explanation set forth the purported bases for denying the applicable tax deductions adequately or with any semblance of precision.

6.      In response to the Notice of Deficiency, the Estate paid the alleged deficiency, as required, plus interest, and on January 17, 2012 filed a claim for refund.

7.      In the more than fourteen months between receipt of the Notice of Deficiency and the filing of this complaint, the Personal Representative has repeatedly sought a coherent and comprehensive explanation from the Service for its erroneous and improper application of the relevant sections of the Code.  The Claim for Refund contained over thirty-five pages of detailed analysis.  The Service, however, has failed to provide any meaningful explanation of its decisions and its resulting assessment of estate taxes contrary to controlling law.  The Service has likewise refused to reconsider its position, even as to the outright charitable bequests and routinely deductible estate expenses.

8.      The Personal Representative is thus compelled to file this complaint to seek a refund of overpaid taxes in an estimated amount of $14,779,066, and an additional refund of tax resulting from additional Estate expenses, including Estate expenses to be incurred in pursuit of the refund, and corresponding deductions, in an amount to be determined, plus all applicable interest and costs.

## PARTIES

9.      Plaintiff Shale D. Stiller serves as the Personal Representative of the Estate under letters of administration issued by the Orphans' Court for Baltimore City on April 10, 2007.  A true and correct copy of the letters of administration is attached as Exhibit A.

10.     Defendant is the United States of America.   More specifically, the Personal Representative challenges the decisions and actions of the Internal Revenue Service.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction pursuant to 28 U.S.C. § 1346(a)(1) and 26 U.S.C. § 7422.

12.     Venue is proper in this District pursuant to 26 U.S.C. § 1391(e)(1).

## FACTUAL BACKGROUND

### *Dr. Robert C. Austrian and His Will*

13.     Robert C. Austrian ("Dr. Austrian"), a lifelong U.S. citizen and resident, was a successful research physician who devoted his professional life to conquering pneumococcal pneumonia, a major killer of the elderly and chronically ill.  Dr. Austrian was acclaimed in his field, and his scholarly work describing the clinical syndrome of pneumococcal meningitis, pneumonia, and endocarditis gave rise to a medical eponym:   the "Austrian Syndrome." Dr. Austrian was born in Baltimore.  He earned both his undergraduate and medical degrees

from Johns Hopkins University.  He joined the medical faculty of the University of Pennsylvania in 1962 and remained affiliated with that university until his death 45 years later.

14.     Dr. Austrian inherited his strong charitable passion from his parents, Dr. Charles R. Austrian ("Charles")[1] and Florence Hochschild Austrian.  When Charles died in 1956, he left an estate that provided trust income for life to his children, Janet Fisher and Dr. Austrian.  Upon the death of the children, the trust remainders passed to Charles's designated charities:  the Johns Hopkins University, the Johns Hopkins Hospital, Sinai Hospital, and the Peabody Institute.  This Court discerned Charles's testamentary intent relative to his designated charitable beneficiaries, similar to that of his son, in *Estate of Fisher v. PNC Bank, N.A., et al,* 769 F. Supp. 2d 853 (D. Md. 2011) (Blake, J.).  Dr. Austrian served as a trustee under his father's will for 51 years until his own death.

15.     Dr. Austrian was married to Babette Bernstein Austrian ("Babette"), who died in 2000.

16.     Though Babette and Dr. Austrian had no children together, Babette had two daughters (collectively, the "Stepdaughters") from her prior marriage:  Jill Bernstein ("Jill") and Toni Bernstein (now Toni Amber, "Toni").  Neither of the Stepdaughters has ever been married or had children.

17.     In her will, Babette left her residuary estate, as well as the assets of a trust created for her benefit by her father, to separate trusts for Jill and Toni (collectively, the "Babette Trusts").

---

[1] First names are used for purposes of clarity.  The Personal Representative intends no disrespect to the Court or the individuals by this informality of address.

18.     Dr. Austrian died testate on March 25, 2007, at the age of 90, leaving roughly $40 million in assets.

19.     On April 10, 2007, the Register of Wills of Baltimore City, Maryland, accepted Dr. Austrian's Last Will and Testament (the "Will") for probate and appointed the Personal Representative.  A true and correct copy of the Will is attached as Exhibit B.

20.     In the Will, Dr. Austrian left $5,000 each to his sister, Janet, and his housekeeper.

21.     Dr. Austrian also donated certain art directly to the Baltimore Museum of Art and the Philadelphia Museum of Art.  Those items have been distributed to the museums.  He gave the rest of his tangible property to his Stepdaughters.

22.     Most of Dr. Austrian's wealth passed as part of his residuary estate to two charitable remainder unitrusts ("CRUTs"), one for each Stepdaughter.   Depending on the outcome of this action, the Personal Representative estimates that each of the CRUTS will hold between $13 and $20 million in trust, based on the tax finally to be assessed and the investment performance of Estate assets between Dr. Austrian's death and the final funding of the CRUTs.

23.     Dr. Austrian directed the trustees of the CRUTs (the "Trustees") to distribute a unitrust amount each calendar year equal to five percent (5%) of the value of each CRUT, determined as of the first day of the year (as to each CRUT, a "Unitrust Amount"), payable in quarterly installments to each Stepdaughter, respectively.

24.     Dr. Austrian also directed that, upon a Stepdaughter's death, the Trustees distribute all remaining assets of that Stepdaughter's CRUT outright to his designated Charities in specified proportions:  Johns Hopkins University School of Medicine, 25%; Johns Hopkins University School of Arts and Sciences, 12.5%; Johns Hopkins University Peabody Institute, 6.25%; Johns Hopkins Hospital, 6.25%; Park School of Baltimore, 6.25%; Maryland Institute

College of Art, 6.25%; American Philosophical Society, 6.25%; University of Pennsylvania School of Medicine, 25%; and College of Physicians of Philadelphia, 6.25%.

25.     While the CRUTs complied completely with the requirements of the Code, they were unusual in that the Stepdaughters, the non-charitable beneficiaries, were not entitled to the entire annual Unitrust Amount.  Rather, Dr. Austrian defined the Stepdaughters' portions of each annual Unitrust Amount according to detailed and narrow criteria, informally referred to here as the "First Prong," the "Second Prong," and the "Minimum Payout."  A Stepdaughter is entitled to receive from the Unitrust Amount of her CRUT each year the sum of the First Prong and the Second Prong, but in no event will she receive less than the Minimum Payout.  The Trustees will then distribute the remaining balance of each year's Unitrust Amount to the Charities in proportion to their respective remainder interests.

26.     Under the First Prong, each Stepdaughter is entitled to "the amount, if any, by which One Hundred Fifty Thousand Dollars ($150,000) [indexed for inflation] exceeds the amounts paid to [her] during said taxable year" from her Babette Trust.  In essence, each Stepdaughter is to receive $150,000, indexed for inflation, funded first by the Babette Trust and second, to the extent necessary, from the Unitrust Amount of her CRUT.  Dr. Austrian further refined the First Prong by increasing the $150,000 target amount to $200,000, still indexed for inflation, during any period in which a Stepdaughter is "institutionalized on a full-time basis because of physical or mental disability."

27.     Under the Second Prong, the Trustees must also pay "the cost of a medical insurance policy for [the Stepdaughter], and . . . the amounts of expenses for medical care, as defined in Section 213(d) of the [Internal Revenue] Code, incurred by [such Stepdaughter], which are not insured."

28.     In addition, Dr. Austrian provided a Minimum Payout as a floor for annual distributions to each Stepdaughter.  He directed the Trustees to distribute to each Stepdaughter (or for her benefit) annually no less than ten percent (10%) of the Unitrust Amount from her CRUT (*i.e.*, the equivalent of one-half percent (0.5%) of the value of her CRUT at the beginning of the year, calculated by taking 10% of the 5% Unitrust Amount).  For example, if Jill's CRUT held $18 million, the Unitrust Amount would be $900,000, and Jill's Minimum Payout would be $90,000, regardless of her distributions from the Babette Trusts or medical expenses; however, if Jill had already received more than $810,000 pursuant to the First and Second Prongs — presumably because of astronomical medical expenses covered by neither regular health insurance nor long-term-care coverage — the Minimum Payout would be reduced so that her total distributions would not exceed the full $900,000 Unitrust Amount.

### *The Reformation Contest and Settlement*

29.     Less than two months after Dr. Austrian's death, a representative of Johns Hopkins University and the Johns Hopkins Hospital wrote to the Personal Representative and suggested that, if the Stepdaughters executed timely disclaimers of their interests in trust assets to the extent such assets exceeded the amount necessary to fund their limited distribution rights, it would result in significant benefits to the Charities by accelerating the time when they would receive the disclaimed interests in the Estate and would not cause any detriment to the Stepdaughters.

30.     The Personal Representative pursued this idea as consistent with Dr. Austrian's testamentary intent to provide the maximum benefit possible to the Charities while also providing for the Stepdaughters in the prescribed manner.  The Stepdaughters, however, refused to make such disclaimers or to cooperate in any other post-mortem modification of the CRUTs

unless they also received cash distributions that the Personal Representative, the Charities, and the CRUT Trustees deemed excessive.  In addition, the Stepdaughters demanded that they be given the right to purchase Dr. Austrian's residence, a Philadelphia apartment, for less than its appraised value.

31.     The resulting dispute between the Stepdaughters, on the one hand, and the Personal Representative and the Trustees, on the other hand, escalated and eventually resulted in multiple lawsuits regarding both Dr. Austrian's Estate and the Babette Trusts.

32.     While the Stepdaughters and the Personal Representative litigated those other suits, the Personal Representative and the Trustees of the CRUTS (collectively, the "Fiduciaries") filed a reformation petition, as authorized under Section 2055 of the Code, in the Circuit Court for Baltimore City on September 8, 2008.

33.     The Fiduciaries proposed to divide each Stepdaughter's CRUT into two equal shares and to reserve one such share exclusively for the Charities.  To preserve the value of each Stepdaughter's Minimum Payout, and thus ensure that each Stepdaughter's respective interest was not harmed in any way, the Fiduciaries proposed that they continue to calculate the Minimum Payout as one-half percent (0.5%) of each Stepdaughter's combined shares.  The Fiduciaries also repeatedly invited the Stepdaughters to suggest any other division between the two proposed shares of each CRUT that they found more acceptable.

34.     The Stepdaughters opposed the reformation, filed motions for summary judgment, and embarked on discovery.

35.     During the discovery period, the Fiduciaries devised an alternate reformation proposal to address the Stepdaughters' proffered objections to the original proposal.

36.     Accordingly, the Fiduciaries filed an amended reformation petition on May 22, 2009, including a separate "Count II" in which they proposed that each CRUT would be divided into two shares — the "Individual Share" and the "Charitable Share" — each of which would distribute a five percent (5%) Unitrust Amount annually.

37.     Each Stepdaughter's distributive rights would be satisfied first from the Unitrust Amount of her Individual Share and only from the Unitrust Amount of the Charitable Share as a last resort.  In this manner, the Stepdaughters' overall interests, however remote, would be absolutely protected.  Each Stepdaughter's payout would be exactly the same as before; it would simply be funded first from one source (the Individual Share) and second, if it should ever be necessary, from the other share (the Charitable Share).

38.     Further, the Trustees proposed to fund each of the Individual Shares with sufficient assets, as determined in the Trustees' discretion, to ensure that the probability of ever being forced to make a distribution to a Stepdaughter from her Charitable Share Unitrust Amount would be so remote as to be negligible.

39.     The Fiduciaries specifically noted in Count II of the amended reformation petition that trusts having only a negligibly remote possibility of ever making a noncharitable distribution, such as the proposed Charitable Shares, qualify for a 100% federal estate tax charitable deduction pursuant to Section 20.2055-2(e)(1)(i) of the Treasury Regulations.

40.     Count II of the amended reformation petition also included two additional proposed modifications to minimize any possibility, however remote, that the Charitable Shares would ever be required to make a noncharitable distribution.

41.     First, in order to conserve the Individual Shares, the Fiduciaries proposed a temporary cap on annual distributions from each Individual Share at an amount equal to its net

income for so long as that net income was sufficient to fund all required distributions to a Stepdaughter.  If a Stepdaughter were ever to become entitled to amounts exceeding the net income in any year, the net income limitation would cease permanently, and her Individual Share would commence standard distributions of the full five percent (5%) Unitrust Amount annually.

42.     Second, to further insulate the Charitable Shares, the Fiduciaries proposed the creation of an accumulation fund (the "Reserve Trust") to hold the Charities' portion of the Individual Share Unitrust Amounts for later distribution to either Stepdaughter, if needed.  The Fiduciaries proposed that the Reserve Trust receive funds for up to twenty years, but that the Trustees be given discretion to determine whether the balance in the Reserve Trust had, at some earlier point, become sufficiently large to make future contributions unnecessary.  Upon the Stepdaughters' deaths, the Reserve Trust would pass to the Charities.  For example, if the Unitrust Amount from the Individual Share of Jill's CRUT for a given year was $250,000, but only $150,000 was paid to Jill (including for health insurance and uninsured medical expenses), the Trustees would pay the remaining $100,000 to the Reserve Trust.

43.     The purpose of these proposals by the Fiduciaries at all times was to honor and implement Dr. Austrian's testamentary intent by guaranteeing payment of the amounts intended for the Stepdaughters while also maximizing the benefit to his designated Charities, both during the Stepdaughters' lives and at their deaths.

44.     Shortly after engaging in a mediation, the Fiduciaries, the Stepdaughters, and the Charities entered into a settlement agreement on November 9, 2009, pursuant to which, among other things, the parties consented to judicial reformation of the CRUTs according to a negotiated set of modifications.

45.     The Circuit Court for Baltimore City reformed the CRUTs in accordance with the settlement agreement in a Consent Order entered on December 10, 2009.  A true and correct copy of the Consent Order is attached as Exhibit C.

46.     Pursuant to the Consent Order, the Court divided each CRUT into an Individual Share and a Charitable Share, to be administered as separate trusts with separate five percent (5%) unitrust distribution requirements.  Each Stepdaughter still receives, in the aggregate, the greater of (i) the sum of the First and Second Prongs, and (ii) the Minimum Payout.  The Minimum Payout is still calculated by reference to the combined value of each Stepdaughter's Individual and Charitable Shares.

47.     The Court directed the Trustees to establish a Reserve Trust for the joint lives of the Stepdaughters, to be funded for a limited number of years (up to twenty) with any portion of the Individual Share Unitrust Amount not paid to or for the benefit of the Stepdaughters.  As set forth above, the balance of the Reserve Trust will pass to the Charities upon the deaths of both Stepdaughters.

48.     The Court also directed the Trustees to make distributions to each Stepdaughter first from the Unitrust Amount payable from her Individual Share (paying any surplus Unitrust Amount to the Reserve Fund), and to make any distributions to a Stepdaughter from the Unitrust Amount of her Charitable Share only to the extent that, in any given year, a Stepdaughter was entitled to more than the Unitrust Amount from the Individual Share plus the assets of the Reserve Trust.  The Court did not limit the Unitrust Amount to the net income of the CRUTs, as that was not a part of the settlement.

49.     In addition, pursuant to the Consent Order and at the demand of the Stepdaughters, the Court converted the First Prong into a simple $90,000 annuity (or $140,000

during any period of disability), indexed for inflation, and thus decoupled it from the Babette Trusts. This change, which was made during negotiations to resolve the reformation issues, resulted in more favorable treatment for the Stepdaughters.

50.     The parties also agreed to exclude long-term care insurance from the scope of the Second Prong. Instead, the Trustees of the Individual Shares are authorized to acquire such insurance on the Stepdaughters as a means to manage the overall risk and reduce fluctuations in value for the benefit of the Charities. The Stepdaughters have no rights to any benefits under any such insurance policy. Their long-term care costs will continue to be covered by the Unitrust Amounts.

51.     Finally, the Court ordered that each Charitable Share be funded with "the smallest fractional share of [the CRUT] that qualifies for the largest possible charitable contribution deduction as finally determined for federal estate tax purposes." Similarly, the maximum value of the Reserve Trust is to be "the smallest amount, as finally determined for federal estate tax purposes, required to be held in the Reserve Trust each year in order for [each] Charitable Share to be treated as a wholly charitable trust for purposes of the federal estate tax charitable deduction." The Court thus directed the Fiduciaries to determine what final division of each CRUT into Individual Shares and Charitable Shares would result in the best outcome for the Stepdaughters and the Charities.

52.     The Stepdaughters' interests were thus fully protected, and the benefits provided to Dr. Austrian's designated Charities were maximized by the judicial reformation of the unitrust interests.

### *The Personal Representative's Dealings with the Internal Revenue Service*

53.     On June 25, 2008, the Personal Representative timely filed an estate tax return for the Estate with the Service and paid the reported estate tax in the amount of $4,745,415.  A true and correct copy of the estate tax return is attached as Exhibit D.

54.     Following the issuance of the Consent Order nearly eighteen months later, the Personal Representative determined "the smallest fractional share of [each CRUT] that qualifies for the largest possible charitable contribution deduction as finally determined for federal estate tax purposes," as directed by the Court.  In doing so, he engaged experts to project, for the Stepdaughters' lifetimes, (a) a projected range for the cost of the Stepdaughters' medical care, (b) a projected range for the cost of long-term care insurance, and (c) a projected inflation rate. To project the yield of the trusts over time, he used the actuarial factor for the month of Dr. Austrian's death.  He then used the highest, most conservative figures in each range to determine the funding for each Stepdaughter's Individual Share that would ensure at least a ninety-five percent (95%) likelihood that the share would be sufficient to pay all amounts due the Stepdaughter during her lifetime, thus resulting in a probability of less than 5% that the Fiduciaries would ever have to draw on the Charitable Shares to pay the Stepdaughters.

55.     The Personal Representative then funded the Individual and Charitable Shares of each CRUT in the following proportions:

|              | Individual Share | Charitable Share |
|--------------|------------------|------------------|
| Jill's CRUT  | 16.90%           | 83.10%           |
| Toni's CRUT  | 18.21%           | 81.79%           |

56.     In March 2010, three months after the Court entered the Consent Order and during the audit of the estate tax return, the Personal Representative, acting at the request of the auditing agent, filed an informal claim for a refund of $3,469,885, based primarily on a claim for a charitable deduction for the entire Charitable Share of each CRUT, rather than just the remainder interest.

57.     In January 2011, the Personal Representative filed Form 843 to formalize the refund claim and increased it to $3,915,055 to include additional estate expenses.  A true and correct copy of Form 843 as Exhibit E.  The Personal Representative and the auditing agent, however, were unable to reach a resolution acceptable to the Service's National Office.

58.     The Service sent the Personal Representative a Notice of Deficiency dated May 27, 2011.  A true and correct copy of the Notice of Deficiency is attached as Exhibit F.  The Service accepted the additional expenses submitted by the Personal Representative on the informally filed Form 843, but assessed an estate tax deficiency of $10,864,011, based largely on its disallowance of the entire charitable deduction.

59.     The Service enclosed with its Notice of Deficiency two separate explanations of its adjustments to the estate tax return.  One explanation was written by the auditing agent and is set forth in a 1999 version of Form 886A (the "Auditor's Report").

60.     The other explanation, which appears to have been written subsequently and by a different individual, is set forth on a 1968 version of the same Form 886A (the "Supervisor's Report").  On page 1 of the Supervisor's Report, the Service denied the Personal Representative's informal claim for refund of $3,469,855 insofar as it related to the charitable deduction, but did not refer to the formal claim for $3,915,055 filed on Form 843.

61.     On or about August 22, 2011, the Personal Representative mailed to the Service a signed Notice of Deficiency Waiver (Form 4089), along with a payment of $12,850,000, which represented the $10,864,011 tax deficiency assessed by the Service plus estimated interest on that amount of $1,985,989.   A true and correct copy of the Notice of Deficiency Waiver is attached as Exhibit G.

62.     The Service calculated the interest owed on the deficiency to be $1,973,981 and thus refunded the excess payment of $12,008 to the Personal Representative.

63.     On January 18, 2012, the Personal Representative timely filed a claim for refund with the Service in the amount of the deficiency assessment, plus interest, and renewed, supplemented, and consolidated the prior claim.  A true and correct copy of this claim for refund is attached as Exhibit H.  The Personal Representative sought a total refund of $14,779,066 in estate tax, plus interest as provided by law.

64.     In the months following the January 2012 claim for refund, the Service neither agreed to any part of the refund nor sent the Personal Representative a notice of disallowance of the refund claim, thus requiring the Personal Representative to file this complaint.

### *The Service's Notice of Deficiency and Assessment of Taxes Was Erroneous*

65.     Each of the Charities is a tax-exempt entity under Code Section 501(c)(3). Transfers to such entities qualify for the estate tax charitable deduction under Section 2055 of the Code.   Transfers for the benefit of the Charities, accordingly, are not subject to estate tax. Because the remainder interests in both the Individual and Charitable Shares and the judicially reformed unitrust interests in the Charitable Shares involve transfers solely for the benefit of the Charities, these transfers qualify for a charitable deduction, and the Estate is thus entitled to a refund.   In addition, the Estate is entitled to a refund attributable to deductions for certain

outright charitable bequests and other routinely deductible items for which the Service denied deductions, such as state death tax payments, estate administration expenses, and legal fees.

### *The Estate is Entitled to a Deduction for the Value of the*
### *Remainder Interests in Both the Individual Shares and the Charitable Shares*

66.     Code Section 2055(a)(2) provides that the value of a taxable estate "shall be determined by deducting from the value of the gross estate the amount of all bequests, legacies, devises, or transfers" to tax-exempt entities.  The Service clarified this rule as to certain interests in Treasury Regulation 20.2055-2:  "If a trust is created or property is transferred for both a charitable and a private purpose, deduction may be taken of the value of the charitable beneficial interest only insofar as that interest is *presently ascertainable*, and hence severable from the non-charitable interest."  (Emphasis added.)  The value of each element of the Stepdaughters' beneficial interests was presently ascertainable as of Dr. Austrian's death.  As a result, the value of the Charities' beneficial interests in the CRUTs was also ascertainable.

67.     In Section 2055(e), however, Congress disallowed the charitable deduction in certain cases where "an interest in property . . . passes . . . from the decedent [for charitable purposes] and an interest . . . in the same property passes . . . from the decedent [for private purposes]."  A trust with both charitable and non-charitable beneficiaries is commonly known as a split-interest trust.

68.     The legislative history of Section 2055(e), enacted in 1969, demonstrates that Congress intended the legislation to prevent certain abuses regarding split-interests trusts, mainly arising from the use of income interests.  These interests were ascertainable, but were also subject to taxpayer manipulation.  To address those abuses, Congress limited deductible interests in split-interest trusts to interests not subject to such manipulation, namely (a) annuity interests

(payment of a fixed amount each year) and unitrust interests (payment of a fixed percentage of the trust's value each year), or (b) remainder interests following annuity or unitrust interests.

69.     Under Section 2055(e)(2) of the Code, therefore, a charitable remainder interest in a split-interest trust is deductible for estate tax purposes if the trust "is a . . . charitable remainder unitrust (described in section 664)."

70.     According to Code Section 664(d)(2), a charitable remainder unitrust must meet the following criteria:  (a) the trustee must be required to distribute annually a unitrust amount of between five and fifty percent (5%-50%), inclusive, to persons, at least one of which is an individual or non-charity, for a term of up to twenty years or, in the case of a life interest, such life beneficiary's lifetime; (b) the trustee may not be authorized to make any additional distributions during the term of the trust; (c) the remainder interest must be payable exclusively to charities; and (d) the value of the remainder interest must be at least ten percent (10%) of the value of the assets passing to the trust.

71.     The CRUTs met all of these qualifications, both before and after the reformation, and the Estate was thus entitled to a charitable deduction for the value of the remainder interests.

72.     The reformation resulted in no material modification of the remainder interests. Indeed, the total actuarial value of the remainder interests is identical before and after the reformation.

73.     Accordingly, the remainder interests in the CRUTs qualify for the estate tax charitable deduction, and the Estate is entitled to a deduction attributable to these remainder interests in an estimated amount of $19,085,799, as shown on the chart attached as Exhibit I**.**

**_The Estate Is Entitled to a Deduction for the Judicially Reformed Charitable Interests_**

74.     The values of the First Prong, the Second Prong, and every other element defining the Stepdaughters' interests in the unitrust interests prior to the reformation were "presently ascertainable" under Regulation 20.2055-2(a).   A detailed discussion of the ascertainability of these values is set forth in Exhibit H at pages 20-24.   The value of the Charities' interest were therefore ascertainable as well, since they are equal to the full value of the unitrust interests _less_ the value of the Stepdaughters' interests.   Under Code Section 2055(a)(2), however, the Estate was not entitled to a deduction for any portion of the unitrust interests.

75.     Pursuant to Code § 2055(e)(3)(B), "a 'qualified reformation' is an alteration of a governing instrument by reformation, amendment, construction, or otherwise which changes a reformable interest into a qualified interest but only if [the change meets certain valuation criteria]."   A "reformable interest" is "any interest for which a deduction would be allowable under [Code § 2055(a), the general provision regarding the charitable deduction] at the time of the decedent's death _but for_ [Code Section § 2055(e)(2)]."   (Emphasis added.)

76.     In this case, the reformable interests were the unitrust interests in the CRUTs, and specifically that portion of those interests that would be paid to the Charities under Dr. Austrian's Will.   Although the value of the Charities' portions of the unitrust interests were _ascertainable_, they were neither unitrust nor annuity payments.   They would therefore have qualified for a charitable deduction _but for_ the limitations of Code § 2055(e)(2).

77.     The sole effect of the Austrian reformation was to separate each CRUT into two trusts, constituting an Individual Share and a Charitable Share.   Each Individual Share remains a CRUT because some or all of the Unitrust Amount will be paid each year to a Stepdaughter.   The

Personal Representative is thus required to pay the estate tax on the value of the unitrust interests in the Individual Shares.

78.      As a result of the judicial reformation, however, the chance that any portion of the Unitrust Amount from the Charitable Shares will be paid to a Stepdaughter is negligible.  The Personal Representative was specifically required, by the terms of the Settlement Agreement and the Consent Order, to divide each CRUT so as to minimize the amount of estate tax payable.  He made such divisions based on the ascertainable values of the Stepdaughters' interests, and he set up the Reserve Trust to further ensure that no Charitable Share would ever be used to fund the First Prong, the Second Prong or the Minimum Payout for a Stepdaughter.  The Personal Representative has made no claim for an estate tax charitable deduction for any portion of the Reserve Trust.

79.      Private interests so remote as to be negligible must be ignored when determining whether property has passed in trust for both charitable and private purposes.  *See* Treas. Reg. § 20.2055(e)(1)(i) and Example (4).

80.      Here, the probability that either of the Charitable Shares will distribute any portion of a unitrust payment to a Stepdaughter (*i.e.*, to a private beneficiary) is so remote as to be negligible.  The Charities are thus the only beneficiaries of the unitrust interests in the Charitable Shares.

81.      Under Treasury Regulations § 20.2055-2(e)(1)(i) and § 20.2055-2(e)(2)(vii), a charitable unitrust interest in a split-interest trust qualifies for a charitable deduction.  Here, the Charities are entitled to receive, each year, five percent (5%) of the value of each Charitable Share, determined as of the first day of such year.  The Charitable Shares thus qualify for the

charitable deduction of $12,569,569 under Code § 2055(a)(2) because they constitute a charitable unitrust interest in a trust with all charitable beneficiaries.  *See* Exhibit I.

82.     Moreover, regardless of whether the reformation constitutes a qualified reformation under Section 2055(e)(3) of the Code, the judicial reformation is the result of a negotiated settlement of a *bona fide* dispute — namely, the dispute between the Fiduciaries and the Stepdaughters — entitling the Personal Representative to a deduction for the entire value of the Charitable Shares, as established by case law.

### *The Estate Is Likewise Entitled to a Deduction for the Entire Charitable Shares under Code Section 2055(a)(2)*

83.     In any event, no requirement exists that all charitable interests arising from the reformation of a split-interest trust must be annuity interests, unitrust interests, or remainders following such interests.  Because the Charitable Shares have no non-charitable beneficiaries, the terms of Code § 2055 (e)(2) do not apply at all, and each Charitable Share, as a whole, qualifies for the estate tax charitable deduction under Code § 2055(a)(2) as the object of a straightforward transfer for the benefit of "corporation[s] organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes."

84.     Whether analyzed as two charitable remainder interests and one charitable unitrust for each Stepdaughter, as described in the prior sections, or as one charitable remainder interest and one wholly charitable trust for each Stepdaughter, the Estate is entitled under either analysis to the same charitable deduction of an estimated $31,655,368, exclusive of the deduction attributable to the outright gifts of art.  *See* Exhibit I.

### *The Service Denies Any Deduction*

85.     In denying any deduction for either the Individual Shares or the Charitable Shares, the Service offered two similar but cryptic explanations.  In the Supervisor's Report, the Service declared that the "Estate has not established that there is at most a 5 percent chance that . . . each [Step]daughter's charitable trust will be invaded."  Alternatively, in the Auditor's Report, the Service declared that "[t]here is a greater than 5% chance that . . . each [Step]daughter's charitable trust will be invaded."  The Service provided no further explanation or support for its conclusions, which plainly contradict the terms of the Consent Order.  If the Service objects to the Personal Representative's determination of the appropriate allocation of assets between the Individual and Charitable Shares, the result should be consideration of a corrective adjustment in the relative sizes of those shares, with a corresponding adjustment in the amount of charitable deduction allowed — not an outright denial of the charitable deduction in its entirety.

### *The Estate Is Entitled to a Deduction for the*
### *Outright Charitable Bequests and Other Routinely Deductible Items*

86.     Outright charitable bequests, such as Dr. Austrian's bequests of art to the Philadelphia Museum of Art and the Baltimore Museum of Art, are unquestionably entitled to tax-exempt treatment pursuant to Section 2055(a)(2) of the Code.  The Estate is therefore entitled to a full charitable deduction of $187,000 for these bequests.

87.     Moreover, estate expenses such as state death tax payments, estate administration expenses, and estate legal fees are routinely deductible items.  Code § 2054.  The Estate is therefore entitled to an estimated deduction of $1,049,183 for additional administration expenses and, depending on the resolution of the charitable deduction issues, an estimated deduction of $377,265 for state death taxes paid to Pennsylvania.  In addition, if the Estate is ultimately held

to have owed any or all of the tax paid after issuance of the Deficiency Notice, interest on such

tax will qualify for a deduction under Treasury Regulation 20-2053-3(a).

### *The Estate Is Entitled to the Entire Requested Refund in an Exact Amount to be Determined*

88.     As additional support for each aspect of the requested refund sought in this

complaint, the Personal Representative incorporates by reference the claim for refund filed with

the Service on January 17, 2012, which explains the Personal Representative's factual and legal

positions in greater detail.  *See* Exhibit H.

89.     The Personal Representative has computed, to the best of his ability, the

deductions improperly denied by the IRS.  Many of these calculations, however, are interrelated,

and all amounts claimed are estimated.  Accordingly, the exact amount of the refund owed to the

Estate must be subject to final determination based on resolution of the controlling legal issues.

## COUNT I

### Estate Tax Refund

90.     The Personal Representative realleges and incorporates the preceding paragraphs

of this complaint as if set forth fully in this count.

91.     Defendant United States, through the decisions and actions of the Service,

erroneously assessed and collected from the Personal Representative the estate taxes and interest

at issue, in violation of the governing internal revenue laws.

92.     The Personal Representative has overpaid the estate tax of the Estate by an

estimated $14,779,066, and is entitled to a refund of the overpayment in an exact amount to be

determined and with all applicable pre-judgment and post-judgment interest as provided by law.

93.     The Estate is also entitled to an estate tax deduction for additional Estate expenses, including any legal fees and other expenses that have been, or will be, incurred in prosecuting the January 18, 2012 claim for refund and this action, and is entitled to a corresponding refund of estate taxes in an exact amount to be determined and with all applicable pre-judgment and post-judgment interest as provided by law.

94.     The Personal Representative is the sole and absolute owner of these claims against Defendant and has made no transfer or assignment of any part of the claims.

WHEREFORE, Shale D. Stiller, the Personal Representative for the Estate of Robert C. Austrian, respectfully requests judgment in its favor and against the United States:

(1)     in the amount of $14,779,066, or such other amount as may be legally refundable, plus pre- and post-judgment interest as provided by law;

(2)     in an amount to be determined for any additional deductions allowed for fees and expenses incurred by the Personal Representative in prosecution of the claim for refund and this action, plus pre- and post-judgment interest as provided by law; and

(3)     for the Personal Representative's costs, attorneys' fees, and such other and further relief as this Court deems appropriate.

## **JURY TRIAL DEMANDED**

Pursuant to Rule 38(b) of the Rules of Civil Procedure, Plaintiff Shale D. Stiller hereby

demands a jury trial on all issues triable by a jury.


Dated:  August 27, 2012

/s/ James D. Mathias
James D. Mathias (Bar No. 06311)
Melissa R. Roth (Bar No. 28051)

DLA Piper LLP (US)
6225 Smith Avenue
Baltimore, Maryland 21209
Telephone:  (410) 580-3000
Facsimile:  (410) 580-3001
james.mathias@dlapiper.com
melissa.roth@dlapiper.com

*Attorneys for Plaintiff Shale D. Stiller,*
*Personal Representative for the*
*Estate of Robert C. Austrian*